

Jason F. Carr
Chief Appellate Attorney
Federal Defenders of Eastern Washington and Idaho
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Counsel for **Flaherty**

United States District Court
Eastern District of Washington

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>   v.<br><br>DANIEL ALLEN FLAHERTY,<br><br>             Defendant. | Case No. 2:08-cr-0137-WFN-29<br><br>Motion to Modify Sentence<br><br>With Oral Argument<br>January 15, 2021. |

**MOTION TO MODIFY SENTENCE DUE TO THE EXTRAORDINARY AND COMPELLING CIRCUMSTANCES PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF THE CASE ...............................................................9

    A.    Compassionate Release Before the First Step Act...................... 12

    B.    Compassionate Release After the First Step Act........................ 13

    C.    United States Sentencing Guideline Section 1B1.13 Does Not Apply to this Motion .................................................................. 15

COVID AND ITS IMPACT ON THE FEDERAL CUSTODIAL ENVIRONMENT 17

    A.    COVID-19 Surfaced then Spread................................................ 17

    B.    BOP's Measures to Contain the Virus........................................ 19

    C.    Dr. Venters' Report ..................................................................... 21

    D.    Mr. Flaherty Cannot Protect Himself While in Prison Custody 28

THIS COURT SHOULD PLACE MOVANT FLAHERTY ON HOME CONFINEMENT FOR THE REMAINDER OF HIS SENTENCE BECAUSE HE MEETS THE LEGAL REQUIREMENTS FOR COMPASSIONATE RELEASE AND EQUITY REQUIRES THAT RESULT ................................................... 34

    A.    Flaherty has Met the Exhaustion Requirement .......................... 34

    B.    Mr. Flaherty Seeks a Modification of his Sentence .................... 35

    C.    COVID-19 Poses a Serious Problem for Penal Institutions ........ 37

    D.    Mr. Flaherty is at High Risk of Hospitalization or Death Due to Coronavirus and the Conditions at Lompoc................................. 41

    E.    The Equities, and 3353(a) Factors, Support Movant Flaherty's Request for a Sentencing Modification......................................... 44

        1.    Protect the Public from Further Crimes and Provide Needed Educational and Vocational Training: ................. 45

        2.    The Nature and Circumstances of the Offense and the Need to Protect the Public .......................................................... 51

        3.    Deterrence .......................................................................... 54

        4.    History and Characteristics ............................................... 56

     5.    Avoiding Unwarranted Sentencing Disparities ................. 58

CONCLUSION ................................................................................ 60

CERTIFICATE OF SERVICE .......................................................... 63

– i –

# INTRODUCTION

Movant and federal prisoner Daniel Allen Flaherty hereby files this motion to modify his 262-month sentence under 18 U.S.C. § 3582(c)(1)(A).[1]  (*See* Electronic Court Filing No. (ECF) 205.) [2]   The underlying legal basis is the fact that he has stage-three kidney disease. (*See, e.g.,* Exhibit (Ex) F, at 15, 25, 27 (sealed medical records).)  This is an incurable condition but those inflicted can slow further progression given the proper conditions and environment.[3]  His prognosis is grime, however, as two of his aunts have needed transplants.  If that fate befalls Mr. Flaherty, he is in significant danger.

---

[1]  Because this filing is relatively replete with footnotes, Mr. Flaherty respectfully requests this Court waive the requirement that footnotes be double-spaced as otherwise required under LCivR 10(d).

[2]  Flaherty's sentence stems from this Court's October 15, 2009 written judgment based on his plea of guilty to one count of Conspiracy to Distribute 500 Grams or More of a Mixture Containing a Detectable Amount of Methamphetamine, a violation of 21 U.S.C. § 846).  (*See* Electronic Court Filing No. (ECF) 1671.)  The Court originally imposed a sentence of 276-months, but modified that downward based on Flaherty's motion for a sentencing reduction based on a retroactive Sentencing Guideline change. (See ECF 2827.)

That judgment imposes a sentence of 192 months along with a five-year term of supervised release. (*See id.*)

[3] *See* Healthline, *Everything you Should Know about Stage 3 Kidney Disease* (Dec. 8, 2020), https://www.healthline.com/health/stage-3-kidney-disease.
Mr. Flaherty asserts that prison conditions are not conducive to arresting the condition's progress.

Compassionate Release Motion
– 1 –

1    Barring a matching donor, the wait for a kidney donation averages

2  five years.[4]

3    To the best of his knowledge, Mr. Flaherty cannot get on a donor

4  list while in custody.

5    Overlaying this condition is the threat of a COVID-19 infection.

6    This Motion provides the legal framework underlying Flaherty's

7  request and further maintains that "extraordinary and compelling"

8  circumstances warrant a sentencing modification. It stresses the

9  following points.

10    First, Mr. Flaherty has adequately pursued prison remedies and

11  hence has met administration exhaustion requirements.[5]  *See* 18 U.S.C.

12  § 3582(c)(1)(A) (2020 rev. ed.) (detailing the requirements).[6] Mr. Flaherty

13

14  [4]  *See* American Kidney Fund, Transplant Waiting List (Dec. 8, 2020), https://bit.ly/2JFJVR8

15  [5] (*See* Exhibit (Ex.) B.)

16  [6] Which reads, in pertinent part:

17    (c) Modification of an imposed term of imprisonment.--The court may not modify a term of imprisonment once it has been imposed except that--

18    (1) in any case--

19    (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully

Compassionate Release Motion
– 2 –

1   even appealed the initial denial.[7]  When that failed, he tried again.[8]  Mr.

2   Flaherty's motion is properly before this Court.  *See United States v.*

3   *Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Haney,*

4   454 F. Supp.3d 316, 321 (S.D.N.Y. 2020) (to satisfy §3582(c)'s exhaustion

5   requirement, a defendant must either exhaust administrative remedies

6   with the BOP or "simply wait 30 days after serving his petition on the

7   warden of his facility before filing a motion in court.").

8        Second, recent case law establishes that universe of what this Court

9   may consider "extraordinary and compelling" is not cabined by the

10  criteria listed in U.S. Sentencing Guideline § 1B1.13.[9]  *See, e.g., United*

11

12          exhausted all administrative rights to appeal a failure of the
            Bureau of Prisons to bring a motion on the defendant's behalf or
13          the lapse of 30 days from the receipt of such a request by the
            warden of the defendant's facility, whichever is earlier, may reduce
14          the term of imprisonment (and may impose a term of probation or
            supervised release with or without conditions that does not exceed
15          the unserved portion of the original term of imprisonment), after
            considering the factors set forth in section 3553(a) to the extent
            that they are applicable, if it finds that--

16  [7] (*See* Ex. B, at 10.)

17  [8] In correspondence, Mr. Flaherty informed counsel on November 7, 2020, that
    he reapplied for compassionate release.  Mr. Flaherty characterized this as "the
    third time," but he may have also been referring to his appeal of the warden's
    first denial.

18  [9] The relevant portion of § 3582(c)(1)(A) states that the court, upon motion of
    the defendant, may reduce a term of imprisonment:

19

Compassionate Release Motion
– 3 –

*States v. Gunn*, No. 20-1959, 2020 WL 6813995 (7th Cir. Nov. 20, 2020);

*United States v. Jones*, No. 20-3701, 2020 WL 6817488 (6th Cir. Nov. 20,

2020); *United States v. McCoy*, No. 30-6821, 2020 WL 7050097 (Dec. 2,

2020). This is an understatement as it is not the case that § 1B1.13 has

limited applicability. The section does not apply at all. *See United States*

*v. Jones*, No. 20-3701, 2020 WL 6817488, at *7-9 (6th Cir. Nov. 20, 2020);

*accord United States v. Brooker*, 976 F.3d 228, 235-36 (2d Cir. 2020)

(explaining that § 1B1.13 survives, but only apply "to those motions the

BOP has made").

---

after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

* * *

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission;

Compassionate Release Motion
– 4 –

Third, Mr. Flaherty's circumstances warrant a sentencing modification. The federal Bureau of Prisons (BOP) houses Mr. Flaherty at USP Lompoc a former "COVID hotspot."[10]  Conservatively, more than seventy percent of the inmates, and at least sixteen staff members, have contracted the disease when considering the entire prison complex, i.e., the minimum-security camps, the low security FCI, and the high security prison.  *See* Federal Bureau of Prisons, COVID-19 Coronavirus, COVID-19 Cases, https://www.bop.gov/coronavirus/ ("Full breakdown and additional details" search).  Four inmates at the complex have died from COVID-19.

This is a dire situation for Mr. Flaherty as kidney disease is a recognized COVID-19 high-risk factor.[11]  Moreover, because the epidemic has overwhelmed Lompoc's medical staff, Mr. Flaherty is not receiving adequate medical care for this kidney disease.  This will lead to a

---

[10] BOP houses Mr. Flaherty in the adjacent minimum security North Camp.

[11] Centers for Diseases Control (CDC), *People with Certain Medical Conditions* (Dec. 9, 2020), https://bit.ly/3lQrx5V.  "Adults of any age with **certain underlying medical conditions** are at increased risk for severe illness from the virus that causes COVID-19.  *Id.* (emphasis in original). "Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death."  *Id.*

Compassionate Release Motion
– 5 –

continuing loss of function as the malady progresses to stage IV.  Already

Mr. Flaherty has difficulty functioning as he is in constant pain, secrets

blood in his urine (hematuria), has elevated levels of creatinine, and

abnormal blood panels.[12]  Any further deterioration and Mr. Flaherty will

be unable to handle the prison environment.[13]

Finally, as mentioned, "the First Step Act freed district courts to

consider the full slate of extraordinary and compelling reasons that an

imprisoned person might bring before them in motions for compassionate

release." *United States v. Brooker,* 976 F.3d 228, 237 (2d Cir. 2020).  Mr.

Flaherty, who has been in custody for approximately twelve years, has

made significant strides in rehabilitating himself.[14]  (*See, e.g.,* Exhibit A,

---

[12] (*See* Ex. F, at 1, 11-14, 25, 33-34, 36.)

[13] Chronic kidney disease has five stages: 1) at stage I, an individual's kidneys function at 90 percent or higher; 2) at stage II, an individual's kidneys function at 60–89 percent, which does not require radical treatment; 3) at stage III, an individual experiences "moderately reduced kidney function" and their kidneys operate at about 30–59 percent; 4) stage IV is marked by "severely reduced kidney function" and an individual "may be feeling quite ill at this stage," as their kidneys only function at about 15–29 percent; and 5) at stage V, an individual's kidneys function at less than 15 percent and they are either waiting for a kidney transplant or are on dialysis. (citing *United States v. Davidson*, 2020 WL 487725, *2 n.2 (Aug. 20, 2020) (citing National Kidney Foundation, *What are the Stages of Chronic Kidney Disease?* (August 6, 2020), https://bit.ly/30eB0u8).)

[14] The criminal docket indicates that the magistrate court arraigned Mr. Flaherty on October 1, 2008, and ordered him detained pending trial on

Compassionate Release Motion
– 6 –

at 7-9 (glowing article from the National Association of Institutional Agribusiness on Mr. Flaherty's job training and progress).)[15]

Mr. Flaherty has served a significant portion of his 264-month sentence.[16]  BOP projects an April 2, 2027 release date.[17]  He is also a good risk for release to home confinement as he possesses strong family support and the means to support himself.[18]

While Flaherty's criminal record reveals drug addiction and distribution activities, he has no convictions for violent activities.[19]  Drug

---

October 3, 2008.  (See Electronic Court Filing Nos. (ECF) 215, 287.)

[15] *But see* 28 U.S.C. § 994(t) (2018) (directing that rehabilitation cannot be the only factor that warrants release).  However, as explained in *McCoy*, "there is no indication that successful rehabilitation efforts may not be considered as one among other factors under § 3582(c)(1)(A)(i), and the government does not argue otherwise here."  2020 WL 7050097, at *11 n.9.

[16] As of December 2020, Mr. Flaherty has served approximately 145 months in custody with 76 remaining, with good time credits.  This is 65.61% of his sentence.  Note that, as detailed in BOP paperwork, Mr. Flaherty has earned Second Chance Act credits which would allow BOP to place him in a half-way house 17-19 months prior to his projected release date.  (*See* Ex. A, at 6 (Program Review comments).)

[17] *See* Federal Bureau of Prisons, *Find an Inmate*, https://www.bop.gov/inmateloc/ (last accessed November 20, 2020).

[18] (*See* Ex. A, at 1-2; *see also* Ex. B, at 11 (detailing Mr. Flaherty's release plan, sentence completion, and medical status as of August 2020.)

[19] (*See* Presentence Investigation Report (PSR) ¶¶ 104-84 (criminal convictions and Criminal History calculation).)

Compassionate Release Motion
– 7 –

distribution, while admittedly serious, is a non-violent offense. Moreover, there is a viewpoint, becoming ever more prevalent, that the harsh sentences imposed for non-violent drug offenses were misguided and ultimately counterproductive.[20]

That said, Mr. Flaherty recognizes he broke federal law and deserves a severe consequence. He did not plead guilty, however, to a capital offense. Mr. Flaherty wants to pay his debt to society, just in a manner that is safe and will allow him to treat his chronic kidney disease condition. With the proper care, there is a possibility he will not need a transplant. If he contracts COVID-19, however, he faces enhanced risk of death or life-altering complications. His serious medical condition, the added risk should he contract COVID-19, and BOP's inability to provide

---

[20] *See, e.g.,* Alyssa Stryker, Drug Policy Alliance, *Rethinking the "Drug Dealer,"* (Dec. 17, 2019), https://drugpolicy.org/drugsellers. Among the findings for the report are that Congress created current drug laws on the premise that they would reduce overall supply, and in turn, consumption. In reality, the opposite has occurred. Meanwhile, we have increased the amount of people incarcerated for selling or distribution offenses by 3000%—from 15,000 in 1980 to 450,000 today—but drugs are more readily available, at significantly lower prices. *See id.* (Key Facts section); *accord* Sean Ross, Investopia, *The Economics of Illicit Drug Trafficking* (Nov. 14, 2019), https://bit.ly/341sgtM ("Basic economic analysis can show why most prohibitions fail to realize their intended goals and why making drugs illegal may actually benefit drug producers and suppliers at the expense of everyone else.").

1  him proper treatment, singularly and cumulatively, constitute a

2  significant, "extraordinary and compelling" factor warranting a sentence

3  modification.  *Cf.* 18 U.S.C. § 3282(c)(1)(A) (2020 rev. ed.).

4      For these reasons, Movant Daniel Allen Flaherty humbly and

5  respectfully requests this Court release him from custody, extend his

6  term of supervised release, and place him on home confinement for the

7  remaining portion of his custodial sentence.

8                    STATEMENT OF THE CASE

9      A federal grand jury indicted Daniel Allen Flaherty on September

10  11, 2008, for conspiracy to distribute 500 grams or more of

11  methamphetamine.[21]    The magistrate court ordered him detained

12  pending trial on October 3, 2008.[22]

13      On May 11, 2009, Mr. Flaherty pleaded to Count 1 of the Second

14  Superseding Indictment alleging a conspiracy to distribute in violation of

15  21 U.S.C. § 846.[23]    The Defendant pleaded guilty pursuant to Federal

16  _____

17  [21] (*See* ECF 1; *see also* ECF 349 (Superseding Indictment); ECF 614 (Second
    Superseding Indictment).)

18  [22] (*See* ECF 278, 287.)

    [23] (*See* ECF 1243, 1244.)

19

                        Compassionate Release Motion

Rule of Criminal Procedure, Rule 11(c)(1)(C) agreement, stipulating that the conspiracy distributed more than 15 kilograms of methamphetamine and that this amount was reasonably foreseeable to Mr. Flaherty.[24]  Mr. Flaherty also agreed that the government properly filed its 21 U.S.C. § 851 thereby increasing his mandatory minimum to twenty years. The United States, in turn, agreed not to file a second § 851 enhancement which would have subjected Mr. Flaherty to a mandatory life sentence. Mr. Flaherty further agreed he was a career offender, stipulating his applicable offense level was a 35 with an advisory guideline range of 292-365 months.[25]  The agreement, however, stipulated to a sentencing range of 264-300 months and further agreed to run a pending supervised release sentence concurrent to that sentence.[26]

Mr. Flaherty agreed to a substantial forfeiture of assets and $23,246.61.  He also waived his right to appeal.[27]

---

[24] (*See* ECF 1246 (written plea agreement).)

[25] (*See id.* at 14, 17.)

[26] (*See id.* at 15, 17.)

[27] (*See id.* at 19-21.)

1    On October 14, 2009, this Court followed the written plea

2    agreement by sentencing Mr. Flaherty to 276 months of incarceration.[28]

3    He did not file an appeal.

4    Mr. Flaherty sought 2255 relief. This Court denied that application

5    on May 24, 2012.[29] The United States Court of Appeals affirmed.[30]

6    Mr. Flaherty had better luck with seeking a sentencing reduction

7    under Sentencing Guideline Amendment 782. After a Ninth Circuit

8    remand, this Court reduced his sentence to 262 months.[31]

9    In this Motion, Mr. Flaherty seeks a sentencing modification based

10   on "compelling and extraordinary circumstances" pursuant to the First

11   Step Act and 18 U.S.C. § 3582(c)(1)(A).

12

13

14

15

16

---

17   [28] (*See* ECF 1669 (sentencing minute entry); *see also* 1671 (Judgment).)

     [29] (*See* ECF 2458.)

18   [30] (*See* ECF 2517.)

19   [31] (See ECF 2826, 2827; *see also* ECF 2811 (Ninth Circuit decision).)

# LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

## A. Compassionate Release Before the First Step Act

The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i) (2020 rev. ed.).

The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to reassess whether a sentence reduction was warranted by factors previously addressed through the abolished parole system. The Sentencing Commission defined "extraordinary and compelling reasons" as including medical conditions, age, family circumstances, and "other reasons." U.S. Sentencing Guideline Manual § 1B1.13, app. n.1(A) (2018).

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons ("BOP"). Over the course of three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. [32]

---

[32] Until 2013, on average, "only [twenty-four] inmates were released each year" through the BOP program.  *See* Hearing on Compassionate Release and the Conditions of Supervision before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see*

## B. Compassionate Release After the First Step Act

On December 21, 2018, the First Step Act became operative changing the applicable framework by allowing defendants to directly petition courts for relief instead of resting the decision solely with wardens.    *See* 18 U.S.C. § 3582(c)(1)(A) (2020 rev. ed.).    The compassionate release statute, as amended by the First Step Act, allows district courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and the Sentencing Commission's applicable policy statements, regardless of BOP's position.

Thus, a district court can grant a sentencing reduction under 18 U.S.C. § 3582(c)(1)(A), where "extraordinary and compelling reasons warrant such a reduction" and "a reduction [would be] consistent with applicable policy statements issued by the Sentencing Commission." The Sentencing Commission also directs courts to consider whether the defendant poses "a danger to the safety of any other person or to the

---

*also United States v. Brooker,* 976 F.3d 228, 230-33 (2d Cir. 2020 (2d Cir. 2020) (detailing the history of statutory compassionate release).

community, as provided in 18 U.S.C. § 3142(g)," and "the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable." U.S. Sentencing Guideline Manual. § 1B1.13 (2018).[33]

Mr. Flaherty's request for compassionate release does not ask the Court to review a BOP decision. Rather, the statutory responsibility to decide whether to extend compassionate release to Flaherty rests solely with the Court.[34] Since the First Step Act took effect, courts have continued to expand compassionate release, finding "extraordinary and compelling reasons" in circumstances beyond the factors of age, medical condition, and family needs BOP has typically relied upon. *See Brooker*,

---

[33] However, as described in the next subsection, the Sentencing Guideline Manual § 1B1.13 compassionate release policy statement is out of date and not responsive to the First Step Act's changes. *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020); *United States v. Jones*, No. 20-3701 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959 (7th Cir. Nov. 20, 2020).

[34] *United States v. Jones*, outlines the three part-test for determining compassionate release eligibility:

> (1) "find[ing]" extraordinary and compelling reasons merit a sentence reduction;8 (2) "find[ing]" that the reduction is consistent with "applicable" Sentencing Commission policy statements; and (3) "considering" the "applicable" § 3553(a) factors.

*Jones*, slip. opin, at 9 (citing *United States v. Ruffin*, 978 F.3d 1000 (6th Cir. 2020) (quoting § 3582(c)(1)(A))).

Compassionate Release Motion
– 14 –

976 F.3d at 237; *United States v. McCoy*, No. 20-6821, 2020 WL 7050097 (4th Cir. Dec. 2, 2020).

### C. United States Sentencing Guideline Section 1B1.13 Does Not Apply to this Motion

Title 18 U.S.C. § 3582(c)(2) directs courts to consider "applicable policy statements issued by the Sentencing Commission." The problem with this directive is there is no applicable policy statement. *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995 (7th Cir. Nov. 20, 2020), and *United States v. McCoy*, No. 20-6821, 2020 WL 7050097 (4th Cir. Dec. 2, 2020), all hold that, because the Sentencing Commission has not yet updated United States Sentencing Guideline Manual § 1B1.13, it does not apply to First Step Act compassionate release motions filed by defendant-inmates. *See Brooker*, 976 F.3d at 245 ("it is manifest that [§1B1.13's] language is clearly outdated and cannot be fully applicable").

To explain, the text of § 3582(c)(1)(A) directs courts to ensure "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The most recent Sentencing Guidelines

Manual, the 2018 edition, has a policy statement, § 1B1.13, implementing the compassionate-release statute. But this policy statement begins: "Upon motion of the Director of the Bureau of Prisons." *See Gunn*, 2020 WL 6813995, at *2. The section has not been updated to reflect the First Step Act's substantial changes. It therefore only applies to motions for release filed by the Director of the Bureau of Prisons. *See Brooker*, 976 F.3d at 235-36 (explaining that § 1B1.13 survives, but only apply "to those motions the BOP has made"); *accord Gunn,* 2020 WL 6813995, at *2 (holding that, until § 1B1.13 is amended the Guidelines Manual "lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release"); McCoy, 2020 WL 70577, at *9 ("In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no "applicable" policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are "empowered ... to consider any extraordinary and compelling reason for release that a defendant might raise." (quoting *Brooker*, 976 F.3d at 230); *see also Jones*, 2020 WL 6817488, at *9 ("In

cases where incarcerated persons file motions for compassionate release, federal judges. . .have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13.).[35]

In sum, a district court abuses its discretion when it relies upon § 1B1.13 in deciding a compassionate release motion initiated by a prison inmate.

## COVID AND ITS IMPACT ON THE FEDERAL CUSTODIAL ENVIRONMENT

### A. COVID-19 Surfaced then Spread

On December 2019, a novel coronavirus—named COVID-19—surfaced in Hubei Province, China.[36]  In what started as a regional outbreak, COVID-19 spread worldwide, infecting over 39 million people and killing more than a million people by mid-October, 2020.[37]  Today,

---

[35] The *McCoy* decision refers to the multi-appellant case *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), as "*United States v. Zullo.*" The Harvard Blue Book, however, directs parties to "[o]mit all parties other than the first listed on each side." *The Bluebook: A Uniform System of Citation* R.10.2.1 (a), at 97 (Columbia Law Review Ass'n et al. eds. 20th ed. 2015).  The first name in the case caption is "Brooker," the last name is "Zullo."

[36] World Health Organization, Q&A on Covid-19, bit.ly/WHO-Covid-19-QA.

[37] *Coronavirus Map: Tracking the Global Outbreak*, The New York Times, October 16, 2020, nyti.ms/NYT-Covid-19-World-Cases.

1  December 11, 2020, that number stands at more than 71,334,932 infected

2  and 1,599,323 deaths.[38]

3  *COVID-19 Map: December 11, 2020*



12      The United States has been particularly hard-hit with COVID-19

13  infecting over 16.2 million in every state and territory, killing more than

14  300,000 Americans.[39]

---

18  [38] *See* WorldoMeter, *Corornavirus*, (Dec. 11, 2020),
https://www.worldometers.info/coronavirus

19  [39] *See id.*

## B. BOP's Measures to Contain the Virus

To combat COVID-19's spread, the BOP instituted a nationwide, phased response plan.  Starting in early-April 2020, it:

- suspended social visit;

- suspended legal visits (with limited exceptions);

-  suspended all programming (e.g., RDAP, classes, etc.); and

- restricted inmate movement (i.e., inmates are confined to their cells for large portions of the day).[40]

The BOP also implemented a mandatory fourteen-day "quarantine" for all incarcerated individuals coming into BOP facilities, as well as all incarcerated individuals who report COVID-19 symptoms or a temperature greater than 100.4 degrees.[41]  BOP places inmates who arrive symptomatic and/or test positive for COVID-19 in "medical isolation."  "Medical isolation" is generally not a sanitary hospital room

---

[40] *See BOP Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (updated October 8, 2020).

[41] *Id.*

1   with an attached washroom; it's placement in the "Special Housing Unit,

2   also known as "the SHU" or "solitary confinement."[42]

3     Placing symptomatic individuals in solitary for two weeks exceeds

4   what experts agree is medically ethical.  "Nearly every scientific inquiry

5   into the effects of solitary confinement over the past 150 years has

6   concluded that subjecting an individual to more than 10 days of

7   involuntary segregation results in a distinct set of emotional, cognitive,

8   social, and physical pathologies."[43]  Those pathologies include panic

9   attacks, disordered thinking and paranoia, compulsive behavior like

10  pacing and cleaning, difficulty concentrating and memory problems,

11  hyperawareness and startle reactions, irritability, anger and despair.[44]

12    These compounding pathologies may cause an individual in

13  solitary, particularly those with mental illness, to despair causing

14

15

16  _____

[42] *Id.*

17  [43] Cloud, Drucker, Brown, and Parsons, *Public Health and Solitary in the*

18  *United States*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4265928/

[44] *See id.* (*A Public Health Ethical Framework* section)

19

1   suicidal ideation to take hold.  The United Nations puts it more bluntly:

2   solitary exceeding 15 days "rises to the level of torture."[45]

3       In short, the carceral environment is a particularly bad place to be

4   during an epidemic.  BOP's measure to contain that risk, while laudable,

5   are destined to, and have, failed.

6       There is another insidious aspect to making quarantine punitive—

7   it makes the prison environment more unsafe because it causes inmates

8   to avoid reporting exposure and symptoms.  Dr. Venters discusses this

9   effect, and much more, in his report on how the federal Bureau of Prisons

10  facility Lompoc has responded to COVID-19. [46]

11  **C. Dr. Venters' Report**

12      This Court is fortunate to have a report that outlines the conditions

13  at Lompoc.  Dr. Venter submitted the report in case CV 20-4450-CBM-

14  (PVCx), *Torres et al. v. Milusnic et al,* in order to allow the court to have

15  a neutral appraisal of the prison's conditions.

---

[45] *See* http://bit.ly/SolitaryReport-June2020 at 3 (last accessed Nov. 20, 2020).

[46] (*See* Ex. C.)

Compassionate Release Motion

Dr. Venter conducted the inspection on September 1st, and 2nd, 2020.[47]  The BOP Lompoc complex is comprised of three administrative areas, FCI Lompoc, also referred to as "the Low" because of its low security status, USP Lompoc, also referred to as "the Medium", for the same reason, and two camp areas, North and South Camps. The first day of inspection focused on FCI Lompoc (the Low) and the second on USP Lompoc (the Medium) and the two camp areas.[48]

In general, the COVID-19 outbreak at Lompoc "has been one of the nation's most overwhelming."[49]  The census of the BOP Lompoc facility was approximately 2,200.  BOP data on September 1, 2020, identified 953 detained people as "recovered" from COVID-19 and three inmates as

---

[47] (*See id.* at 4.)

[48] (*See id.*)  BOP houses Mr. Flaherty in the North Camp.

[49] (*Id.* at 2.)  In July 2020, the Office of the Inspector General of the U.S. Department of Justice issued a report on the COVID-19 response at Lompoc. (*See* Ex. D.)  Like Dr. Venter's report, it several areas of deficiency in the response, including inadequate staffing of health and correctional staff, lack of adequate testing and screening of detained people, inadequate leadership, shortage of personal protective equipment and extremely limited use of home confinement as an alternative for high-risk people.

Compassionate Release Motion

actively infected.[50]  BOP reports four people have died from COVID-19 related illness.[51]

Dr. Venter describes conditions in the camps and his discussions with inmates housed therein.[52]  There appeared to be ample cleaning supplies but some bunks were situated close to each other.

The inmates confirmed that, as in the rest of the facility, sick call requests take more than a week for response. [53]  Chronic care patients have not received treatment for more than six months.[54]  Approximately a quarter of people in the camps reported lingering COVID-19 symptoms including pain with breathing, headaches, loss of taste and smell, joint stiffness, and weakness.[55]  "None of them reported being seen after leaving medical isolation to be asked about ongoing COVID-19 symptoms

---

[50] (*See* Ex. C, at 2.)

[51] (*Id.*)

[52] (*See id.* at 10-13.)

[53] (*See id.* at 12.)

[54] (*See id.*)

[55] (*See id.*)

or disability and several reported that they had submitted multiple sick call requests for these symptoms without being seen."[56]

Inmates reported difficulty accessing care when they became ill with COVID-19, "as well as concerns about having been labelled asymptomatic when they tested positive despite being actually ill with COVID-19 weeks earlier."[57]

There is an increased chance of an inmate introducing COVID-19 into one of the camps because BOP does not screen them from work details.[58]  BOP officials do not wear masks, "including the count officers who rotate between units."  BOP does not attempt to implement or promote social distancing in medication or clinic ques.[59]

---

[56] (*See id.* at 12-13.)

[57] (*Id.* at 13.)

[58] (*See id.*)

[59] (*See id.*)

Compassionate Release Motion

1    Several people expressed reluctance to report COVID-19 symptoms

2    out of fear of the prison transferring them to quarantine which "operated

3    like solitary confinement."[60]

4    Dr. Venter presents an unbiased analysis that highlights areas

5    where Lompoc's COVID-19 response it positive.[61]    For instance, the

6    prison handles staff screening well and has, or used to have, a dedicated

7    COVID-19 hospital unit.[62]  Yet there are areas of deficiencies.

8    For instance, Dr. Venter found several areas where Lompoc fails to

9    adequately screen for the virus.[63]   "Taken together, these screening

10   deficiencies increase the risk that patients will become seriously ill or die

11   from COVID-19 and also increase the potential spread of the virus."[64]

12   Lompoc medical personnel fail to timely response to sick calls and

13   chronic care.  This is not a trivial failing as "[t]hese encounters are central

14

15   _____

     [60] (*Id.*)

16   [61] (*See id.* at 19-20.)

17   [62] (*See id.* at 19.)

18   [63] (*See id.* at 21-22.)

     [64] (*Id.* at 21.)

19

Compassionate Release Motion
– 25 –

to the facility['s] COVID-19 response."[65]  The lack of appropriate chronic care is salient to Mr. Flaherty as it will cause his kidney disease to unduly progress.[66]

As self-reported by numerous inmates, Dr. Venter confirms that there is a lack of infection control in housing areas.[67]  For instance, the Centers for Disease Control has clearly identified the ability to dry one's hands with a single use paper towel or air dryer as critical to COVID-19 response.[68]

This was not possible for all inmates:

> In one housing area I was told by BOP leadership that paper towels were not needed because of the presence of a hand dryer.  I tested the hand dryer and it was broken. Staff and detained people in the unit confirmed that it had not worked for over one year.[69]

---

[65] (*Id.* at 22.)

[66] (*Cf. id.* at 23 ("almost all people in the chronic care service" report it takes "far longer than the 3-6-month window" claimed by BOP staff).

[67] (*See id.* at 24-25.)

[68] COVID-19: *Handwashing* (Sept. 21, 2020) https://www.cdc.gov/coronavirus/2019-ncov/global-covid-19/handwashing.htm.

[69] (Ex. C, at 24.)

Finally, Dr. Venter outlined the negative impacts of the prison's punitive approach to quarantine.[70] "While not directly related to quarantine, the intimidation and threatening of detained people to behave in a manner prescribed by correctional staff during the inspection is another very concerning example of a punitive response to the COVID-19 outbreak in the facility."[71]

Dr. Venter makes a number of recommendations to improve Lompoc's conditions and ends with this summary:

> The COVID-19 outbreak at BOP Lompoc has been one of the prison system's most expansive, in terms of the percentage of detained people who were infected as well as those who died. The response of the BOP and PHS to this unprecedented challenge at Lompoc exhibits both significant strengths and serious deficiencies. Overall, the COVID-19 response at BOP Lompoc is characterized by some evidence-based strategies being superimposed on a grossly inadequate COVID-19 cases, slow the spread of the virus and protect high risk patients have been incompletely implemented. Many of the deficiencies in health access flow directly from chronic, unaddressed understaffing. This problem has been previously identified but I am very concerned by facility leadership's inability to discuss or quantify how these shortages relate to the COVID-19 response.[72]

---

[70] (*See id.* at 25.)

[71] (*Id.*)

[72] (*Id.* at 28-29.)

Implementing Dr. Venter's recommendations "will take time."[73]  It is unclear whether BOP was implemented any of Dr. Venter's suggestions.

### D. Mr. Flaherty Cannot Protect Himself While in Prison Custody

Judges across the country are learning that prisons are "powder kegs for infection" that have allowed "the COVID-19 virus to spread with uncommon and frightening speed." *United States v. Rountree*, 460 F.Supp.3d 224, 232 (N.D.N.Y. 2020 (citation omitted); *see also United States v. Young*, 460 F.Supp.3d 71, (D. Mass. 2020) ("As the virus can appear suddenly and spread quickly in the prison population, I cannot find that Ms. Young's risk of exposure is insignificant.").

---

[73] (*Id.* at 29.)

1    Mass virus spread is exactly what happened at Lompoc. The

2  catastrophic outbreak at Lompoc was documented in the news,[74] district

3  court orders, Dr. Venters' Report, and in a class action lawsuit by the

4  ACLU.[75]



5

6

7

8

9

10

11

12

13

14

15

16

17  ——————————

18  [74] Tyler Hayden, *Lompoc Prison Explodes with Active COVID-19 Cases*, Santa Barbara Independent (May 13, 2020), https://bit.ly/3gUbC4D.

19  [75] *See Torres v. Carvajal*, No. 20-cv-4450 (C.D. Cal. May 16, 2020) (class-action complaint).

As of December 14, 2020, the BOP lists the following information for Lompoc:

| Facility | Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|---|
| Lompoc USP | 1 | 1 | 2 | 0 | 139 | 28 |
| Lompoc FCI | 0 | 0 | 2 | 0 | 691 | 19 |

There are reasons to question the reported numbers.

First, BOP regularly transfer inmates between the two facilities. The outbreak intertwines between the USP and the FCI.[76]

Second, the BOP's classification of inmates as "recovered" is problematic. The class action lawsuit contains a declaration of Shamsher Samra, M.D., Assistant Professor of Clinical Medicine at University of California, Los Angeles and a faculty member in the Department of

---

[76] *Carvajal*, No. 20-cv-4450 at 24.

Compassionate Release Motion

Emergency Medicine at Harbor-UCLA.[77] Dr. Samra works in the LA County jails after receiving his M.D. from Harvard Medical School.[78]

Dr. Samra describes the following problems with BOP's classification of "recovered" inmates:

15. Moreover, it is my understanding that BOP now contends that a substantial number of the prisoners who recently tested positive have "recovered." To the extent these prisoners have actually recovered from the illness, that does not absolve the need for preventive measures. In particular, it is not yet clear whether people who have been infected develop immunity against future infection by COVID-19.

16. Furthermore, if it is true that BOP is classifying prisoners as "recovered" without re-testing them, that would be very problematic. Indeed, the need for continued rigorous preventive measures is only heightened if BOP has not relied on appropriate methods for determining whether prisoners have in fact recovered. In an ideal scenario, an individual would only be deemed "recovered" after testing negative. Relying instead, for instance, on patient reports of symptoms may not be sufficient in a correctional setting, where prisoners may be reluctant to share information with staff. Furthermore, asymptomatic individuals can still be carriers of the disease. And in a large communal living space, where social distancing cannot be strictly adhered to, individuals should be tested regularly in order to quickly identify and isolate anyone who may contract COVID-19 before it spreads through the population.

As detailed, *supra*, Doctor Homer Venters report, submitted in Central District of California No. 2:20-cv-04450-CBM-PVC, ECF 101-1,

---

[77] Declaration of Shamsher Samra, M.D., exhibit in *Carvajal*, No. 20-cv-4450.

[78] *Id.*

provides a comprehensive overview of the situation in FCI Lompoc.[79]

Review of this report provides the court with insight into the conditions

in this facility.

This Court would not be alone in its concern for vulnerable

defendants at Lompoc. District courts around the country have granted

compassionate release for nonviolent defendants with health concerns

putting them at risk of death or hospitalization, particularly at Lompoc:

> *United States v. Kamaka*, 2020 WL 2820139 (D. Haw. May 29, 2020) (granting emergency motion for compassionate release for Lompoc inmate: 49-year-old defendant with hypertension. The Court recognized that the "true case count may be much higher" than reported by BOP);

> *United States v. Gorai*, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) (granting compassionate release for asthmatic Lompoc inmate);

> *United States v. Young*, 2020 WL 2614745 (W.D. Wash. May 22, 2020) (granting compassionate release to a 64-year-old black Lompoc inmate with hypertension and chronic kidney disease);

> *United States v. Barber*, 466 F.Supp.3d 1127 (D. Or. 2020) (granting compassionate release to Lompoc inmate with hypertension and diabetes, who tested positive for the coronavirus);

> *United States v. Connell*, 2020 WL 2315858 (N.D. Cal. May 8, 2020) (published order) (granting compassionate release for 69-year-old Lompoc inmate with hypertension, high cholesterol, and diabetes);

---

[79] (Attached as Exhibit D.)

1

2      *United States v. Pippin*, 2020 WL 2602140 (W.D. Wash. May 20,
       2020) (granting compassionate release to Lompoc inmate with
3      pancytopenia, which made him particularly vulnerable to COVID-
       19);

4      *United States v. Robinson*, 2020 WL 1982872 (N.D. Cal. Apr. 27,
       2020) (granting compassionate release to Lompoc inmate who
5      suffered    from    hypertension    and    psoriasis    requiring
       immunosuppressant medications: "Lompoc Prison is currently
6      battling one of the most serious COVID-19 outbreaks in the
       nation.").
7

8          Lompoc is simply too dangerous for Mr. Flaherty given his chronic

9   kidney condition.

10         In sum, Mr. Flaherty has a confirmed COVID-19 risk factor—

11  chronic kidney disease—and is housed in an institute where the virus

12  has been prevalent in the past and not managed well.  The facility is

13  understaffed and ill-equipped to handle his chronic condition.  Mr.

14  Flaherty is a strong candidate for a modification of his sentence under 18

15  U.S.C. § 3582(c)(1)(A)(i).

16

17

18

19

Compassionate Release Motion

1

2

3

**THIS COURT SHOULD PLACE MOVANT FLAHERTY ON HOME CONFINEMENT FOR THE REMAINDER OF HIS SENTENCE BECAUSE HE MEETS THE LEGAL REQUIREMENTS FOR COMPASSIONATE RELEASE AND EQUITY REQUIRES THAT RESULT**

4

**A. Flaherty has Met the Exhaustion Requirement**

5

6

7

8

9

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must exhaust administrative remedies with the BOP or wait thirty days after submitting a request for compassionate release to the warden, whichever comes first.  *See* 18 U.S.C. § 3582(c)(1)(A) (2020 rev. ed.).  Mr. Flaherty has met those requirements.

10

11

12

13

14

15

16

17

Exhibit B to this filing details Mr. Flaherty's efforts to exhaust his administrative remedies.  He filed a request for "compassionate release" on August 5, 2020.[80]  Lompoc officials took more than thirty days to respond.[81]  Therefore, Mr. Flaherty has met § 3582(c)(1)(A)'s modest exhaustion requirements.  *Cf. United States v. Burill*, 445 F.Supp.3d 22, (N.D. Cal. 2020) (explaining inmate Burill exhausted his request by emailing the Associate Warden even though the government maintained

18

19

---

[80] (*See* Ex. B, at 1-3.)

[81] (*See id.* at 9.)

Compassionate Release Motion
– 34 –

1   that the prison "did not understand [Burill's] email to be a submitted

2   request for a sentence reduction within the meaning of 18 U.S.C. section

3   3282").

4       Mr. Flaherty went beyond these requirements as he filed an appeal

5   of the warden's decision; also known as a BP-9 appeal.[82]  At this time,

6   counsel for Flaherty does not know the status of that appeal.  However,

7   Mr. Flaherty did correspond with counsel on November 7, 2020, by way

8   of the prison's inmate email system stating that he made a formal request

9   for release "for the third time."

10      Mr. Flaherty meets 18 U.S.C. § 3582(c)(1)(A)'s exhaustion

11  requirements.

### B. Mr. Flaherty Seeks a Modification of his Sentence

12       Mr. Flaherty seeks to convert his remaining custodial sentence into

13  a term of supervised release with a home confinement condition.  His

14  request is grounded in, and authorized by, 18 U.S.C. § 3582(c)(1)(A).[83]

---

[82] (*See id.* at 10-11.)

[83] The term "compassionate release" is a "misnomer." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).  Title "18 U.S.C. § 3582(c)(1)(A):

> in fact speaks of sentence reductions. A district court could,
> for instance, reduce but not eliminate a defendant's prison

Compassionate Release Motion

In § 3582, Congress explicitly empowered courts to convert time remaining on custodial sentences to home confinement via supervision. The Court "may reduce the term of imprisonment" and "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A) (2020 rev. ed.); *accord United States* v. McCoy, CA No. 20-6821, 2020 WL 7050097, at *2 (4th Cir. Dec. 2, 2020) (describing the First Step Act's changes to federal sentencing law). The power lies in that statute. *See United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *3 n.7 (7th Cir. Nov. 20, 2020).

Statutory and case law authority support the remedy Mr. Flaherty seeks.[84]

---

sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place. Id. Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad.

*Id.* (citing *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc)).

[84] The United States Attorney's Office sometimes misinterprets this request for relief as an attempt to convince the Bureau of Prisons to release a prisoner to home confinement under 18 U.S.C. § 3624(c). It is true that BOP has exclusive authority under that provision. It is also irrelevant to this motion.

Compassionate Release Motion

– 36 –

## C. COVID-19 Poses a Serious Problem for Penal Institutions

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[85]  On March 13, 2020, the President declared a national emergency due to the evolving threat of the coronavirus (COVID-19) outbreak.  To slow the spread of the disease, the Centers for Disease Control and Prevention [hereinafter CDC] has broadly advised people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[86]

These precautions are difficult for incarcerated individuals. Public health experts warn that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep

---

[85] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19.

[86] *Id.*

themselves safe."[87]    The conditions in BOP facilities are therefore, unfortunately, a hospitable environment for COVID-19 to spread.[88]

Whatever precautions and procedures BOP undertake to safeguard its inmates, it is plain that prisons are a dangerous place to be during a pandemic.

Epidemiology researchers from Washington State University, University of Pennsylvania, University of Tennessee, and the ACLU estimate that jails alone, by spreading infections to the community, may increase the total coronavirus death count "by almost another 100,000"

---

[87] *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf

[88] Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910; Vice, "Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits" (Mar. 24, 2020), available at https://www.vice.com/ en_us/ article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

people.[89] BOP simply cannot box hundreds of inmates into a dormitory and expect anything other than rapid viral spread.[90]

These graphs demonstrates BOP's inability to control COVID-19's spread:

---

[89] ACLU, *COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, at 1 (April 2020) (available at https://bit.ly/2OdejRb); *accord* Michael Olive, *How COVID-19 in Jails and Prisons Threatens Nearby Communities*, PEW Charitable Trusts (July 1, 2020), available at: https://bit.ly/3fag9yc ("Not only can the virus be brought into jails and prisons, but it also can leave those facilities and spread widely into surrounding communities and beyond.")

[90] Joseph J. Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission.

*United States v. Rodriguez*, 451 F.Supp.3d 392, 403 (E.D. Penn. 2020).





There is, however a solution—reduce the prison population. Courts from around the country have heeded the call from legal and medical experts by releasing vulnerable inmates from BOP facilities.[91] Granting compassionate release reduces COVID-19 risks for both inmates and staff.

### D. Mr. Flaherty is at High Risk of Hospitalization or Death Due to Coronavirus and the Conditions at Lompoc

In evaluating the coronavirus outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility. *See*

---

[91]  In 2019, federal courts granted 145 compassionate release motions; incarcerated individuals filed ninety-six (67.1%) of the motions, and the BOP filed the other forty-seven (32.9%). *United States v. Jones*, 2020 WL 6817488, at *5 (citing U.S. Sentencing Commission, *The First Step Act of 2018: One Year of Implementation*, at 47 & n.43 (Aug. 2020). Since then the pace has increased markedly:

> We are now well into the second year of the First Step Act's implementation, a year defined by COVID-19." *Id.* The BOP denied or ignored more than 98% of compassionate release requests in the first three months of the pandemic. Now unhindered by the BOP's procedural bars, incarcerated persons' filing and federal courts' granting § 3582(c)(1)(A) motions have surged this year. 10,940 federal prisoners applied for compassionate release between March and May 2020, and federal courts have compassionately released an estimated 1,700 persons in 2020 so far.

*Id.* (citation sources omitted).

Compassionate Release Motion
– 41 –

*United States v. Feiling*, 453 F.Supp.3d 832, 841 (E.D. Va. 2020) (citing, inter alia, *United States v. Edwards*, 451 F.Supp.3d 562, 567-69 (W.D. Va. 2020)).    Several courts have held that "the fear of contracting a communicable disease" alone cannot be considered an "extraordinary and compelling reason" to justify a sentence modification. *Id.* (citing *United States v. Clark*, 451 F.Supp.3d 651, 655-56 (M.D. La. 2020) (internal quotation marks and emphasis omitted)).

That said, the Court is not cabined to considerations about COVID-19 and its impact in what factors it may consider in determining whether "extraordinary and compelling" conditions exist.    *See United States v. Coy*, 2020 WL 7050097, *9 (Dec. 2, 2020) ("In short, we agree with the Second Circuit and the emerging consensus in the district courts: There is as of now no "applicable" policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are "empowered. . .to consider any extraordinary and compelling reason for release that a defendant might raise." (citing *Zullo*, 976 F.3d at 230.); *see also United States v. Rodriguez*, 451 F.Supp.3d 392, 396 (E.D. Penn. 2020) (Congress

never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation ... alone" does not suffice (citing 18 U.S.C. § 994(t) . . . and § 1B1.13 is "clearly outdated").

Mr. Flaherty's advances more than a general fear of contracting COVID-19.  He has a chronic, incurable, condition—Stage III kidney disease.[92]  As documented in Dr. Venter's report, Lompoc is short-staffed and overwhelmed by dealing with the pandemic.[93]  Mr. Flaherty will not receive the care he needs to combat his condition and prevent further deterioration.[94]

The Centers for Disease Control and Prevention (CDC) recognizes those with kidney disease "are at advanced risk of severe illness from the virus that contains COVID-19" regardless of age.[95]  *See United States v.*

---

[92] (*See* Ex. F, at 1-2, 14-15, 25, 57.)

[93] (*See* Ex. C, at 12, 23.)

[94] For instance, controlling blood sugar and exercising at least thirty minutes a day helps to slow progression.  *See* Managing Chronic Kidney Disease (Dec. 15, 2020), https://bit.ly/3oUfqFR.  Dietary restrictions help the process.  (*See id.*)  It is difficult for Mr. Flaherty to follow these guidelines in an environment where he has no choice but to eat the good given to him and lock-downs prevent exercise.

[95] *See* CDC, *People with Certain Medical Conditions* (Dec. 12, 2020), https://bit.ly/3lQrx5V

Compassionate Release Motion
– 43 –

*Davidson*, 2020 WL 4877255, at \*18 (W.D. Penn. 2020) ("Here, there is no doubt that Mr. Davidson is suffering from a serious medical condition from which he is not expected to recover: chronic kidney disease."). BOP is unlikely to ameliorate this condition in custody. *Cf. id.*

Mr. Flaherty bases his motion for compassionate release on conditions that have changed since his October 14, 2009 sentencing.[96] He meets the criteria for release because the BOP is not equipped to contain COVID-19 and protect vulnerable inmates such as Mr. Flaherty from death or lasting complications. Nor will the facility be able to treat his chronic condition.

### E. The Equities, and 3353(a) Factors, Support Movant Flaherty's Request for a Sentencing Modification

Section 3582(c) directs courts to consider 18 U.S.C. § 3553(a) sentencing factors when determining a petition for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A) (2020 rev. ed.); *see also United States v. Ruffian*, 978 F.3d 1000, 1003 (6th Cir. 2020) (explaining that district courts may deny relief under § 3553(a) factors even if

---

[96] (*See* ECF 183 (minutes of proceeding); *see also id.* at 185 (Judgment).)

"extraordinary and compelling" reasons would otherwise justify relief).

Consideration of those factors supports Mr. Flaherty's request for

release. [97]

### 1. Protect the Public from Further Crimes and Provide Needed Educational and Vocational Training:

Mr. Flaherty has used his time in prison to better himself to avoid

recidivism.  He has taken a myriad of classes, including college credit

courses.[98]    *Cf. Pepper v. United States*, 562 U.S. 476, 490-93 (2011)

---

[97] Eight Amendment concerns also support Mr. Flaherty's request for a sentencing modification. As noted, however, by the Supreme Court of the United States:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty *631 that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment.

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

Thus the Eighth Amendment is violated when the conditions at a jail deprive inmates of one or more basic human needs,. *See Wilson v. Seiter*, 501 U.S. 294, 300 (1991).  This basic human need for "reasonable safety" prohibits the housing of inmates in situations likely to lead to the spread of illness, sickness, and communicable disease. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993); *accord Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982) (stating that it is "cruel and unusual punishment to hold convicted criminals in unsafe conditions").

[98] (*See* Ex. A, at 6.)

(allowing courts to consider favorable post-sentencing rehabilitation into account during resentencing).

**Individualized Reentry Plan - Program Review  (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: FLAXXITT, DANIEL ALLEN  69436-085

SEQUENCE: 60862793
Team Date: 03-04-2020

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| SAF | C | PSYC MINDFULNESS | 04-03-2013 | 04-03-2013 |
| SAF | C | R-AGRO - RELATIONSHIP SKILLS | 04-03-2013 | 05-15-2013 |
| SAF | C | R-3:JOB FAIR | 04-29-2013 | 05-14-2013 |
| SAF | C | 10 KEY DATA ENTRY | 04-07-2013 | 03-27-2013 |
| SAF | C | ADVANCED KEYBOARDING | 04-07-2013 | 03-27-2013 |
| SAF | C | INTERMEDIATE KEYBOARDING | 04-07-2013 | 03-27-2013 |
| SAF | C | BEGINNING KEYBOARDING | 04-07-2013 | 03-27-2013 |
| SAF | C | R-18/LT AIDS AWARE | 03-07-2013 | 03-07-2013 |
| HER | C | HEALTH 24-LCC | 08-30-2012 | 12-21-2012 |
| HER | C | WORLD RELIGIONS-LCC | 08-30-2012 | 12-21-2012 |
| HER | C | MATH 99(AA DEGREE)-LCC | 08-30-2012 | 12-21-2012 |
| HER | C | READY TO WORK(D) | 09-20-2012 | 09-20-2012 |
| HER | C | SOCIOLOGY 24-LCC | 09-18-2012 | 08-09-2012 |
| HER | C | PRINCIPLES OF PSYCH-LCC | 09-18-2012 | 08-09-2012 |
| HER | C | HISTORY 17-LCC | 09-18-2012 | 08-09-2012 |
| HER | C | ENGLISH1 WRITING-LCC | 05-17-2012 | 05-25-2012 |
| HER | C | WESTERN CIVILIZATION 2-LCC | 05-17-2012 | 05-25-2012 |
| HER | C | WESTERN CIVILIZATION-LCC | 05-17-2012 | 05-25-2012 |
| HER | C | HIST16-PRE CIVIL WAR-LCC | 05-17-2012 | 05-25-2012 |
| HER | C | ENGLISH PREREQUISITE 4-LCC | 08-23-2011 | 12-22-2011 |
| HER | C | ART APPRECIATION-LCC - | 08-23-2011 | 12-22-2011 |
| HER | C | PHYSICAL ANTHROPOLOGY | 08-23-2011 | 12-22-2011 |
| HER | C | AP/DENTAL ASSISTANT | 03-01-2010 | 05-15-2011 |
| HER | C | INTRO TO SOC-LCC | 01-18-2011 | 05-27-2011 |
| HER | C | MATH 55(AA DEGREE)-LCC | 01-18-2011 | 05-27-2011 |
| HER | C | POLITICAL SCIENCE-LCC | 05-12-2010 | 12-17-2010 |
| HER | C | SEG WORLD HIST | 05-12-2010 | 12-17-2010 |
| HER | C | GENERAL PSYCH-LCC | 06-07-2010 | 09-26-2010 |
| HER | C | COUNSELING GUIDANCE-LCC | 06-07-2010 | 09-26-2010 |
| HER | C | TYPING RM (12-1PM) | 04-09-2010 | 05-07-2010 |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|---|---|
| ** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ** | |

**Current Care Assignments**

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 01-31-2013 |
| CARE1-MH | CARE1-MENTAL HEALTH | 08-05-2010 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR-REGULAR DUTY | 01-31-2013 |
| YES F/S | CLEARED FOR FOOD SERVICE | 01-01-2013 |

**Current Drug Assignments**

| Assignment | Description | Start |
|---|---|---|
| DAP DIAG | DRUG ABUSE DIAGNOSIS PENDING | 06-13-2014 |
| ED COMP | DRUG EDUCATION COMPLETE | 04-01-2011 |
| NR COMP | NRES DRUG TMT/COMPLETE | 03-19-2012 |

**FRP Details**

Most Recent Payment Plan

FRP Assignment:  COMPLT  FINANC RESP-COMPLETED  Start: 05-11-2010
Inmate Decision:  AGREED  $100.00  Frequency: SINGLE
Payments past 6 months:  $0.00  Obligation Balance: $0.00

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|

Sentry Data as of 02-19-2020  Individualized Reentry Plan - Program Review  (Inmate Copy)  Page 2 of 4

**Individualized Reentry Plan - Program Review (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for Inmate: FLEXXITT, DANIEL ALLEN 89436-095

SEQUENCE: 00862793
Team Date: 03-04-2020

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| SAF | C | PSYC MINDFULNESS | 04-03-2013 | 04-03-2013 |
| SAF | C | R-4X/GRO - RELATIONSHIP SKILLS | 04-03-2013 | 05-15-2013 |
| SAF | C | R-2/JOB FAIR | 04-29-2013 | 05-14-2013 |
| SAF | C | 10 KEY DATA ENTRY | 01-07-2013 | 03-27-2013 |
| SAF | C | ADVANCED KEYBOARDING | 01-07-2013 | 03-27-2013 |
| SAF | C | INTERMEDIATE KEYBOARDING | 01-07-2013 | 03-27-2013 |
| SAF | C | BEGINNING KEYBOARDING | 01-07-2013 | 03-27-2013 |
| SAF | C | R-15/LT AIDS AWARE | 02-07-2013 | 02-07-2013 |
| HER | C | HEALTH 2-LCC | 06-20-2012 | 12-21-2012 |
| HER | C | WORLD RELIGIONS-LCC | 08-20-2012 | 12-21-2012 |
| HER | C | MATH 50(AA DEGREE)-LCC | 08-20-2012 | 12-21-2012 |
| HER | C | READY TO WORK(?) | 08-23-2012 | 09-20-2012 |
| HER | C | SOCIOLOGY 2-LCC | 05-15-2012 | 08-00-2012 |
| HER | C | PRINCIPLES OF PSYCH-LCC | 05-15-2012 | 08-00-2012 |
| HER | C | HISTORY 17-LCC | 05-15-2012 | 08-00-2012 |
| HER | C | ENGLISH1 WRITING-LCC | 01-17-2012 | 05-25-2012 |
| HER | C | WESTERN CIVILIZATION 24-LCC | 01-17-2012 | 05-25-2012 |
| HER | C | WESTERN CIVILIZATION-LCC | 01-17-2012 | 05-25-2012 |
| HER | C | HIST16-PRE CIVIL WAR-LCC | 01-17-2012 | 05-25-2012 |
| HER | C | ENGLISH PREREQUISITE-LCC | 08-23-2011 | 12-22-2011 |
| HER | C | ART APPRECIATION-LCC - | 08-23-2011 | 12-22-2011 |
| HER | C | PHYSICAL ANTHROPOLOGY | 08-23-2011 | 12-22-2011 |
| HER | C | AP/DENTAL ASSISTANT | 07-01-2010 | 08-15-2011 |
| HER | C | INTRO TO SOC-LCC | 01-18-2011 | 05-27-2011 |
| HER | C | MATH 51(AA DEGREE)-LCC | 01-18-2011 | 05-27-2011 |
| HER | C | POLITICAL SCIENCE-LCC | 08-12-2010 | 12-17-2010 |
| HER | C | BEG WORLD HIST | 08-12-2010 | 12-17-2010 |
| HER | C | GENERAL PSYCH-LCC | 05-07-2010 | 09-29-2010 |
| HER | C | COUNSELING GUIDANCE-LCC | 05-07-2010 | 09-29-2010 |
| HER | C | TYPING PM (12-1PM) | 04-09-2009 | 05-07-2010 |

**Discipline History (Last 6 months)**

| Hearing Date | Prohibited Acts |
|---|---|

** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS **

**Current Care Assignments**

| Assignment | Description | Start |
|---|---|---|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 01-31-2013 |
| CARE1-MH | CARE1-MENTAL HEALTH | 08-03-2010 |

**Current Medical Duty Status Assignments**

| Assignment | Description | Start |
|---|---|---|
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 01-31-2013 |
| YES F/S | CLEARED FOR FOOD SERVICE | 01-31-2013 |

**Current Drug Assignments**

| Assignment | Description | Start |
|---|---|---|
| DAP DIAG | DRUG ABUSE DIAGNOSIS PENDING | 08-15-2014 |
| ED COMP | DRUG EDUCATION COMPLETE | 04-01-2011 |
| NR COMP | NRES DRUG TMT/COMPLETE | 02-15-2012 |

**FRP Details**

Most Recent Payment Plan

FRP Assignment: COMPLT FINANC RESP-COMPLETED Start: 05-11-2010
Inmate Decision: AGREED $100.00 Frequency: SINGLE
Payments past 6 months: $0.00 Obligation Balance: $0.00

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|

Sentry Data as of 02-19-2020      Individualized Reentry Plan - Program Review (Inmate Copy)      Page 2 of 4

Mr. Flaherty has paid his financial obligations and earned a
significant number of credits under the Second Chance Act:



With one exception that occurred many years ago, where Mr.
Flaherty found tobacco while working and unwisely decided to keep it, he
has had an exemplary record in prison.

1    Mr. Flaherty has earned BOP's trust.  In his job as farm driver and

2    clerk, he delivers products to other BOP facilities.  This required BOP to

3    issue him an indefinite furlough for this purpose:

4

5

6                              U.S. Department of Justice

                                              Federal Bureau of Prisons

7    ─────────────────────────────────────────────
                                     *Federal Correctional Complex*
                                     *3901 Klein Blvd.*
8                                    *Lompoc, California 93436*

9                                              May 28, 2020

10   MEMORANDUM FOR L. J. MILUSNIC, ACTING COMPLEX WARDEN

11   FROM:          Y. Carlon, Camp Unit Manager

     SUBJECT:       . DANIEL ALLEN FLAHERTY Reg #09436-085

12

     The above inmate maintains a Commercial Driver License and has
13   received specialized training related to his position as a Farm
     driver.  His duties will include delivering farm products to BOP
     facilities.  At this time he is the most appropriate inmate to
14   maintain this Federal Prison Industry work assignment.

     According to Program Statement 5280.09, Inmate Furloughs, the
15   Warden may approve a furlough outside the established guidelines.

16   Approved/Denied

17   ─────────────────────────────────────
     L. J. Milusnic, Acting Complex Warden

18

19

Compassionate Release Motion

– 49 –

1    The Bureau of Prisons does not believe Mr. Flaherty poses a risk of

2    danger to the community.  Neither should this Court.

3    This Court has the unique opportunity to verify Mr. Flaherty's

4    progress.  A recent article from the National Association of Institutional

5    Agribusiness interviewed Mr. Flaherty and his supervisor.[99]    The

6    supervisor's report of Mr. Flaherty's is glowing:



Asked how he sees his future once he's released, Flaherty responded by saying "I had some jobs in construction operating a back-hoe, and was starting a call center marketing business when I was arrested, but I never really thought I was cut out for a career working for someone else or with a big company – I just didn't think I had much to offer. After my time with UNICOR, and especially after completing this program my perspective has changed completely; I've seen what I can accomplish in the right organization and in a hands-on learning environment. I'm an example of what on-the-job training and experience can do for a person; I know what I can achieve and that when I'm released that I truly can contribute in meaningful ways and provide for myself and my family."

"Our mission at UNICOR is to protect society and reduce crime by preparing inmates for successful reentry through job training," so says Fred Hayes, "we've embraced that philosophy here in Lompoc from a bottoms-up perspective

whether we're mending fences, milking cows or preparing detailed budgets. Inmate Flaherty has excelled in everything that I've asked of him, and he's become a leader and mentor among the other inmates on our crew. He's found a new direction in his life and I'm pleased that we've been able to give him the education and life tools to help him have a better, honest life when he completes his sentence."

Of the Clerk Training Program overall, Hayes went on to state "We've recognized the long lead time to train our clerks, and even though we graduate a clerk every four months, I made the commitment to keep bringing in new inmate trainees on a regular basis. This program has been a real success for our business, but more importantly we really are changing lives with it for the positive and at the end of the day, that's our mission."

---

[99] (See Ex. A, at 7-9.)

Mr. Flaherty asks this Court to consider his remarkable achievements. "He's found a new direction in his life."

### 2. The Nature and Circumstances of the Offense and the Need to Protect the Public

While Mr. Flaherty's history of narcotics distribution is disturbing, he does not appear to have any convictions involving violence or sexual predation.[100]

Mr. Flaherty has been in custody for more than twelve years on this offense. The justification for such draconian sentences is that they reduce crime. In the case of non-violent drug offenses, however, evidence suggests the opposite.[101]

---

[100] (*See* Presentence Investigation Report (PSR) ¶¶ 111-84 (detailing Mr. Flaherty's criminal history)). Mr. Flaherty does not include his arrest history in this summary as predicating a sentencing decision based on an arrest violates the due process right to the presumption of innocence. *See, e.g., United States v. Johnson*, 648 F.3d 273, 277-79 (5th Cir. 2011).

[101] *See, e.g.,* Saadatman, Toma, & Choquette, *The War on Drugs and Crime Rates*, J. of Bus. & Econ. Research, Vo. 10, No. 5 (2012), available at https://www.researchgate.net/publication/315583486 (finding the incarceration of drug offenders causes a crowding-out effect in prisons, releasing non-drug offenders and thereby increasing, rather than reducing crime); *see also* Mark Thornton, *The Economics of Prohibition* (1991) (revealing how prohibition inevitably creates incentives for producers to increase the potency of drugs and alcohol products distributed via the black market).

The government will point to Mr. Flaherty's recidivism regarding drug offenses as a basis for disallowing a sentencing modification. Fair enough. However, from an economics standpoint it is not at all surprising that the strong pull of free market forces repeatedly ensnared Mr. Flaherty. The more the government attempts to restrict the supply of narcotics by incarcerating distributor, the more the market responses by increasing the rate of return for suppliers.[102] It is a vicious cycle and one the government will never win. It hasn't to date but the costs to society, both pecuniary and socially, have been significant.

Yet, the crime is not truly victimless. Mr. Flaherty recognizes his actions have caused significant social harm. Still, courts find the relatively nonviolent, market-based aspect of drug distribution crimes

---

[102] *See, e.g,* Benjamin Powell, *The Economics Behind the U.S. Government's Unwinnable War on Drugs*, The Library of Economics and Liberty (July 1, 2013), available at https://www.econlib.org/library/Columns/y2013/Powelldrugs.html (Dec. 12, 2020).

There is no question drug distribution is a free market activity. If the global drug trade were a country, it would have one of the top twenty economies in the world. In 2005, the United Nations estimated the global illegal drug trade is worth more than $320 billion. *See* Richard Branson, *The War on Drugs a Trillion-Dollar Failure*, CNN Opin. (Dec. 7, 2012), https://www.cnn.com/2012/12/06/opinion/branson-end-war-on-drugs/index.html.

mitigating.  For instance, in *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *12 (6th Cir. Nov. 20, 2020), the district court, while ultimately denying early release, looked favorably upon the fact Mr. Jones' instant conviction was for a non-violent drug offense and "he has behaved well during his current incarceration."  *See also United States v. Luna*, 2020 WL 4696621, at *3 (N.D. Cal. Aug. 13, 2020) (finding Mr. Luna would not pose a danger to the community if released because his instant and prior offenses involved immigration "and non-violent drug offenses).

Before the instant offense, the longest sentence Mr. Flaherty served was forty-six months.[103]  He has served three times that amount in the case *sub judice*.  This Court can take a chance that the lesson has finally made its required mark.  If it hasn't, this Court would be fully empowered to send him right back to prison given his supervision term would be at least ten years.  Because his crime of conviction is a Class A felony, it can send him back to prison for up to five years and them put him right back on supervision.  *See* 18 U.S.C. § 3583(e)(3)(2018).

---

[103] (*See* PSR ¶ 46.)

The risk in releasing Mr. Flaherty to home confinement is low. The benefit to him, and society given his significant strides in job training and rehabilitation, are high. Mr. Flaherty respectfully asks this Court to take a chance on him. It may be surprised at the results.

### 3. Deterrence

Keeping Mr. Flaherty in prison does not serve a deterrent purpose. The National Institute of Justice (NIJ), an arm of DOJ itself, recognizes that: "Sending an individual convicted of crime to prison isn't a very effective way to deter crime."[104] What deters crime is the "*certainty* of being caught," not the harshness of punishment. "Research shows *clearly* that the chance of being caught is a vastly more effective deterrent than even draconian punishment."[105]

Adding to the NIJ's conclusion is proof from the Sentencing Commission, which recently released a compelling study proving that longer sentences do not afford additional deterrence. In July 2020, the commission published a lengthy study comparing two groups:

---

[104] Nat'l Institute. of Justice, *Five Things About Deterrence* (June 5, 2016), https://bit.ly/2XA9g2s.
[105] *Id.* (emphasis added).

Compassionate Release Motion

1  (1) offenders released on average three-years early under the drugs-

2  minus-two guideline amendment; and (2) offenders who would have been

3  eligible but completed their entire sentences before the amendment.[106]

4  The verdict: longer sentences have no deterrent effect. "There was **no**

5  **statistically significant difference** in the recidivism rates" between the

6  groups—in fact, the early-release group actually had a slightly lower

7  recidivism rate.[107] Thus, both the NIJ and Sentencing Commission agree

8  that holding Mr. Flaherty in prison longer will serve no deterrent

9  purpose.

10      A term of imprisonment was not the only punitive impact of Mr.

11  Flaherty's arrest and conviction.  He agreed to forfeit the gains from this

12  crime including $23,246.61 in cash and numerous assets.[108]  Given Mr.

13  Flaherty was gainfully employed in the construction industry at the time

14  of the offenses, it is reasonable to posit that not all of what he forfeited

15  was criminally tainted.

16

17  [106] U.S. Sentencing Commission, *Retroactivity & Recidivism: The Drugs Minus Two Amendment* (July 2020), https://bit.ly/3e62vN0).

18  [107] *Id.* at 6 (noting that the Retroactivity Group recidivated at 27.9%, while the Comparison Group that served the higher sentences recidivated at 30.5%).

19  [108] (*See* ECF 1246, Plea Agreement, at 19-20.)

Significantly, as discussed during his sentencing, the government seized his home. Mr. Flaherty maintained he purchased it with lawful funds. Law enforcement failed to maintain the residence during the winter causing pipes to freeze thereby ruining the residence. This caused hardship to the family.[109]

Mr. Flaherty realizes these occurrences were the product of his criminal activity. In mentioning them, he does not wish to cast aspersions or blame. He only asks that the Court consider it in gauging the quantum of punishment already imparted.

### 4. *History and Characteristics*

There is no contesting the fact that Mr. Flaherty's criminal history contains arrests for drug abuse and drug dealing. That history only tells part of his story.

Mr. Flaherty's exposure to drugs came at an early age. When he was five years old and living in California, his parents would leave him with his grandparents, Ed and Florence Slaughter. Ed and Florence used

---

[109] (*See* ECF 2654, Sentencing Transcript, at 11-12.)

Compassionate Release Motion

marijuana, and Ed would give young Flaherty marijuana because he thought it was "humorous."[110]  This exposure to drugs continued through elementary, junior high, and high school.

While living in Spokane, young Flaherty's mother had a relationship with Michael Barnes, who was heavily involved in both drug dealing and abuse.[111]  Michael Barnes was the closest thing Mr. Flaherty had to a father and he looked up to him. By the time he was eleven, Mr. Flaherty was regularly using marijuana with Mr. Barnes.[112]

When Mr. Flaherty was in high school, Michael Barnes would give Daniel Flaherty marijuana to sell to his classmates.  Eventually, Michael Barnes and Daniel Flaherty began to use "hard" drugs such as cocaine, acid, heroin, crack, psilocybin mushrooms, LSD, and methamphetamines. [113]  In fact, Michael Barnes gave Flaherty more marijuana to sell at school to help pay for their hard drug habit.  Mr.

---

[110] (*See* PSR ¶¶ 215-23.)

[111] (*See id.* ¶¶ 215-16.)

[112] (*See id.* ¶¶ 215, 218.)

[113] (*See id.* ¶ 218.)

Compassionate Release Motion
– 57 –

1  Flaherty's drug abuse and dealing continued well into his 20s and 30s as
2  outlined by the PSI Report.

3        Another fact not indicated by his Mr. Flaherty's criminal history is
4  his work ethic.   Around 2004, Defendant Flaherty began to develop a
5  career in the construction industry. As stated by the Presentence
6  Investigation Report, Mr. Flaherty "participated in a heavy equipment
7  operator's course through Spokane Community College" in 2005, which
8  he found "to be a very positive experience that helped him to obtain good
9  jobs."[114]

10       The situation has changed now for Mr. Flaherty.  He has strong
11 outside support, a robust release plan and a plan for obtaining medical
12 insurance and care.[115]

13 ### 5. Avoiding Unwarranted Sentencing Disparities

14       A   court   can   consider   sentencing   disparities   with   other   co-
15 defendants when sentencing a defendant. *See United States v. Daas*, 198
16 F.3d 1167, 1180-81 (9th Cir. 1999); *accord United States v. Ray*, 930 F.2d

17

18 ────────────
   [114] (*See id.* at ¶¶ 229-33.)

19 [115] (*See* Ex. A, at 1-2; Ex. B, at 2.)

Compassionate Release Motion
– 58 –

1368, 1373 (9th Cir. 1991) (noting that disparity in sentencing among co-defendants is "one of the most important evils the guidelines were intended to cure.")

At the time of his original sentencing, Mr. Flaherty's sentence was in excess of those of his codefendants:



Mr. Flaherty recognizes there are many differences in conduct and prior history that can account for the differences. Still, Mr. Flaherty does believe it salient to consider that he has already done more time than many of his codefendants.

Mr. Flaherty respectfully submits that § 3553(a) sentencing factors weigh in favor of a sentencing modification.

## CONCLUSION

*It has long been said that a society's worth can be judged by taking stock of its prisons.*

-Justice Sotomayor[116]

Mr. Flaherty recognizes he committed a serious crime that warrants a serious sentence. To date he has served more than twelve years. While he recognizes this Court imposed a significantly larger sanction, this Court did not, and could not, have foreseen the COVID-19 pandemic that would scar the world with its grim presence. Mr. Flaherty is confident this Court meant to impose a fair, just, and reasonable sentence. That sentence did not include the prospect of an early demise or serious lingering health complications. *See generally United States v. Safirstein*, 827 F.2d 1380, 1385 (9th Cir. 1987) (explaining that a sentence based on a material misapprehension of fact violates due process).

---

[116] *Valentine v. Collier*, 140 S. Ct. 1598 (2020) (Sotomayor, J., statement on denial of application to vacate stay).

1

As one court explained:

2

> [These facilities] are plainly not equipped to protect
> Petitioners from a potentially fatal exposure to COVID-
3
> 19. While this deficiency is neither intentional nor
> malicious, should we fail to afford relief to Petitioners
> we will be a party to an unconscionable and possibly
4
> barbaric result. Our Constitution and laws apply
> equally to *the most vulnerable among us*, particularly
> when matters of public health are at issue. This is true
5
> even for those who have lost a measure of their
> freedom. If we are to remain the civilized society we
6
> hold ourselves out to be, it would be heartless and
> inhumane not to recognize Petitioners' plight. And so
> we will act.

7

*Thakker v. Doll*, 451 F. Supp. 3d 358, 371 (M.D. Pa. 2020).

8

Mr. Flaherty meets the statutory and equitable criteria for

9

compassionate release.  He has a serious, high-risk medical condition.

10

Not only is he in enhanced danger if he contracts COVID-19, BOP cannot

11

provide the care he needs to avoid needing a kidney transplant.  He seeks

12

not liberty, but a form of punishment that does not include the danger of

13

chronic illness or death.

14

For these reasons, in the interests of justice and fairness, Daniel

15

Allen Flaherty respectfully requests this Court enter a time-served

16

sentence, increase his term of supervised release, and have him serve

17

that remaining time on home confinement.

18

19

1  Dated: December 17, 2020.

2                                Federal Defenders of Eastern Washington &
                                Idaho
3

4

5                                */s/ Jason F. Carr*
                                JASON F. CARR
6                                Chief Appellate Attorney
                                Nevada Bar No. 006587
7                                10 North Post Street, Suite 700
                                Spokane, Washington 99201
8                                (509) 624-7606
                                Jason_Carr@fd.org
9

10

11

12

13

14

15

16

17

18

19

                        Compassionate Release Motion

## CERTIFICATE OF SERVICE

I certify that on December 17, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System.  That system will notify Assistant United States Attorney Earl Allan Hicks of this filing.

/s/ *Jason F. Carr*
JASON F. CARR,
Chief Appellate Attorney
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
Jason_Carr@fd.org